UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

MICKEDA BARNES,
    Plaintiff,

v.

AMALGAMATED TRANSIT UNION,
DIVISION 618,
    Defendant.

No. 18-cv-594-JJM-LDA

## MEMORANDUM AND ORDER

JOHN J. MCCONNELL, JR., United States Chief District Judge.

Before the Court is Defendant Amalgamated Transit Union, Division 618's ("Union") Motion for Summary Judgment. ECF No. 18. Ms. Barnes alleges that the Union discriminated against her in its representation of her because of her disability. ECF No. 34-1 at 1.[1] The Union alleges that it fairly represented Ms. Barnes and did not discriminate against her in the process. ECF No. 18-1 at 2.

## I. BACKGROUND

This case began in February 2015 when Ms. Barnes slipped and fell at work, injuring her wrist, and causing her to be out of work. ECF No. 19 at ¶ 23–24. Ms. Barnes had been a bus driver employed by the Rhode Island Public Transit Authority ("RIPTA") for about 13 years. *Id.* at ¶ 22. Because this injury occurred as a result of her fall, she filed a workers compensation claim. *Id.* at ¶ 24. Ms. Barnes worked

---

[1] Plaintiff voluntarily dismisses Counts I, II, and those parts of Count III that pertain to race- and sex-based discrimination. ECF No. 34-1 at 1.

closely with RIPTA Manager Diane Salisbury, who handled workers compensation claims, over the next few months. *Id.* at ¶ 26.

In May 2015, Ms. Barnes had carpal tunnel surgery on her left wrist. *Id.* at ¶ 29. A few days later, her doctor, Dr. Michael Souza, gave her a medical note saying that she will be returning to work "before to July 8, 2015." *Id.* at ¶ 30. She later received a note from Dr. Souza saying that she could return to work on June 24, 2015. *Id.* at ¶ 48.

RIPTA conducted a bus route choosing session, where drivers, according to seniority, chose their bus routes for the coming period. Nicholas DeCristofaro, a Union Steward who handled administering the bus routes selection, spoke with Ms. Barnes about choosing a bus route. *Id.* at ¶ 36, 38. Ms. Barnes was adamant in her desire to choose, which lead to Mr. DeCristofaro speaking with RIPTA Director James Dean about this matter. *Id.* at ¶ 39. RIPTA told Ms. Barnes she could not choose because she had not returned to work before the choices were being made. *See id.* at ¶ 41.[2] As a result, Ms. Barnes could not choose a bus route. *Id.* at ¶ 37. Indeed, a driver must be available to start the route on the day of the route change; otherwise, "you would be assigned to an open run or the spare list." *Id.* at ¶ 34.

A few weeks later, Ms. Barnes met with Tom Cute, the Business Agent/President of the Union. ECF No. 24 at ¶ 17. At this meeting, Ms. Barnes informed Mr. Cute that RIPTA barred her from choosing a bus route. *Id.* Mr. Cute

---

[2] During this meeting, Ms. Barnes allegedly threw a water bottle at Mr. DeCristofaro that subjected her to discipline by RIPTA. ECF No. 19 at ¶ 40.

reiterated to Ms. Barnes that the reason RIPTA prevented her from choosing a bus route was because she was not cleared to work before the start of the new bus routes. ECF No. 19 at ¶ 55.

*Ms. Barnes' Worker's Compensation Claim*

At her next Workers Compensation Court hearing, RIPTA denied Ms. Barnes' request to return to work with accommodations. ECF No. 24 at ¶ 21. The Union did not represent her during this hearing.[3] *See id.* at ¶ 23.

Ms. Barnes' goal at this point appears to have been to return to work. She spoke with Kevin Cole, Vice President of the Union, and told him that Ms. Salisbury was refusing to accept her doctor's note. ECF No. 19 at ¶ 68. More particularly, her note said that she "was being treated for carpel tunnel syndrome of her left wrist and that she can return to work June 24 with some restrictions," such as routes with limited stops and a shift that did not exceed five hours. *Id.* at ¶ 75. But when she went to Workers' Compensation Court, Ms. Barnes alleges that RIPTA's lawyer told her that she could only return to work if she relinquished an earlier workers' compensation claim about an unrelated injury. *Id.* at ¶ 77. Ms. Barnes did not agree to do so, and so RIPTA did not allow her to return to work on June 24. *Id.* at ¶ 78.

Ms. Barnes then met with Mr. Cole and Mr. DeCristofaro from the Union to discuss next steps. *Id.* at ¶ 81–82. Ms. Barnes told Mr. Cole that she felt the Union was not helping her return to work. ECF No. 24 at ¶ 29. The Union claims that Ms.

---

[3] The Union does not represent individuals on workers' compensation matters. ECF No. 19 at ¶ 64.

Barnes did not ask it to file a grievance on her behalf.[4] *See* ECF No. 19 at ¶ 85. At this point, Mr. Cute intervened and spoke with Mr. Dean from RIPTA asking him to allow her to choose a route, but he could do nothing because the routes had already been chosen. *Id.* at ¶ 87–88.

*Disciplinary Charges Against Ms. Barnes*

RIPTA initiated disciplinary procedures against Ms. Barnes claiming she threw a water bottle at Mr. DeCristofaro and that she made "unprofessional comments to members of the Cranston Fire Department at a rescue scene." *Id.* at ¶ 92. Mr. Cute met with Ms. Barnes and prepared notes to argue on her behalf at her disciplinary hearing. *Id.* at ¶ 94, 96. Based on her conduct, RIPTA suspended her for thirty working days. *Id.* at ¶ 102. Mr. Cute then informed Ms. Barnes that the Union would file two grievances on her behalf, one for each incident. *See id.* at ¶ 106–08. If this solution were not amenable to Ms. Barnes, she could ask for arbitration. *Id.* at ¶ 108.

After a hearing, RIPTA denied her grievances.[5] *Id.* at ¶ 134. In discussing next steps, Mr. Cute recommended that Ms. Barnes attend the next Union meeting to request arbitration. *Id.* at ¶ 135. Before arbitration, the Union tried to settle her grievances, as it commonly does. *Id.* at ¶ 136–37. Ms. Barnes did not want to settle her claim because she did not feel she did anything wrong, nor did she believe she

---

[4] It is disputed as to whether she provided a grievance to the Union that was never filed. ECF No. 24 at ¶ 35.

[5] The grievance process is a four-step process. But both "RIPTA and the Union agreed to proceed directly to the third step of the grievance process." ECF No. 19 at ¶ 124.

would have a fair hearing if her matter were to be arbitrated. *See id.* at ¶ 138, 140, 143. Moreover, Ms. Barnes did not want to waive her right to sue RIPTA if she went to arbitration. *Id.* at ¶ 147. Indeed, Ms. Barnes did not trust Mr. Cute, nor did she believe that he would adequately represent her. *Id.* at ¶ 151. Ms. Barnes then filed a charge of discrimination with both the Equal Employment Opportunity Commission and the Rhode Island Commission for Human Rights against Messrs. Cute, Cole, and DeCristofaro of the Union. ECF No. 19-13. This claim was based on, among other things, RIPTA's and the Union's treatment and representation of her for her disability. *Id.* at 1; *see* ECF No. 24 at ¶ 38–39.

Ms. Barnes and Mr. Cute discussed her potential employment reclassification. ECF No. 19 at ¶ 158–59. There were difficulties in these conversations, which included Mr. Cute scheduling meetings with Ms. Barnes, Ms. Barnes not attending those meetings, and Ms. Barnes not returning his calls. *See id.* at ¶ 160–66. This led to Mr. Cute not submitting his drafted request for reclassification. *Id.* at ¶ 167.

*RIPTA Fires Ms. Barnes*

On February 15, 2016, RIPTA ended Ms. Barnes's employment because she was absent from work for more than one year. *Id.* at ¶ 169. Ms. Barnes came to the Union and requested a grievance based on her termination. *Id.* at ¶ 170. Mr. Cute called Gerard P. Cobleigh, the attorney for the Union, to discuss whether this was permissible. *Id.* at ¶ 172–73. Mr. Cobleigh approved and told Mr. Cute to file a grievance for Ms. Barnes. *Id.* at ¶ 174. They collectively filed a grievance, with Ms. Barnes handwritten notes attached. *Id.* at ¶ 177.

5

Ms. Barnes expressed her disappointment during this meeting with Mr. Cute and Mr. Cole that she had been unable to return to work despite her doctor's notes. *Id.* at ¶ 179. Mr. Cute responded that because those notes related to workers' compensation, the Union lacked knowledge of them. *Id.* at ¶ 181, 186; *see also supra* footnote 3. Mr. Cute also said that "because the one-year provision of the [Collective Bargaining Agreement] is contractual, the Union does not typically grieve terminations on behalf of members who are out of work for more than one-year." *Id.* at ¶ 187.

The Union still filed a grievance on her behalf, and again went directly to Step 3. *See id.* at ¶ 191–92. Mr. Cole represented Ms. Barnes at this hearing,[6] and argued for a reclassification of her employment and for lighter work, such as "clerical" work. *Id.* at ¶ 194, 199–200. Indeed, Ms. Barnes was looking for some accommodations aside from what she may do as a bus driver. *Id.* at ¶ 208. RIPTA and Mr. Cole discussed Ms. Barnes' limitations, and what her capabilities for work might be. *Id.* at ¶ 205. Her capabilities were unclear given that her doctor did not test what she could and could not do. *Id.* at ¶ 206.

Based on the facts from this hearing, RIPTA decided to fire her "based solely on the fact that [Ms. Barnes] was not medically cleared to return to her position within one year from the date her absence began." ECF No. 19-50 at 2. Mr. Cute sent a letter to Ms. Barnes, attaching the decision and informing her of her right to

---

[6] Ms. Barnes "does not allege that [Mr.] Cole subjected her to discrimination." ECF No. 19 at ¶ 230.

request arbitration. ECF No. 19 at ¶ 212. Ms. Barnes did not request arbitration but did "complain to the National Amalgamated Trust Union that she had not been fairly represented by Division 618." *Id.* at ¶ 215, 217. In addition, Ms. Barnes filed a discrimination action against RIPTA in state court for a failure to accommodate her disability, which RIPTA removed to federal court and settled. *See id.* at ¶ 221–23.

Ms. Barnes now sues the Union alleging that the Union discriminated against her because of her disability.

## II. STANDARD OF REVIEW

Fed. R. Civ. P. 56 controls in deciding whether a party is entitled to summary judgment. "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56. More particularly,

> the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.

*Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). When deciding whether the Court should grant summary judgment, the Court should "view the facts in the light most favorable to the nonmoving party, drawing all reasonable inferences in that party's favor." *Barbour v. Dynamics Rsch. Corp.*, 63 F.3d 32, 36 (1st Cir. 1995).

As alluded to, there must first be no genuine issues of material fact. "[M]ere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that

there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986) (emphasis in original). Thus, the issue must be genuine and material. *See ibid.* "In this context, 'genuine' means that the evidence about the fact is such that a reasonable jury could resolve the point in favor of the nonmoving party. . . . '[M]aterial' means that the fact is one that might affect the outcome of the suit under the governing law." *Morris v. Gov't Dev. Bank of Puerto Rico*, 27 F.3d 746, 748 (1st Cir. 1994) (citations omitted) (internal quotation marks omitted).

Additionally, the moving party must have a right to judgment as a matter of law. The moving party is "'entitled to a judgment as a matter of law' because the nonmoving party has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof." *Celotex*, 477 U.S. at 323. The Court decides this latter element of the summary judgment standard by evaluating "whether there is [evidence] upon which a jury can properly proceed to find a verdict for the party producing it, upon whom the *onus* of proof is imposed." *Anderson*, 477 U.S. at 252 (emphasis in original) (internal quotation marks omitted).

## III. DISCUSSION

Ms. Barnes asserts her three claims should survive the Union's Motion for Summary Judgment: the Rhode Island Fair Employment Practices Act, R.I. Gen. Laws § 28-5-7; the Americans with Disabilities Act, 42 U.S.C. § 126 ("ADA"); and Rhode Island Civil Rights of People with Disabilities Act, R.I. Gen. Laws § 42-87-1. She asserts that the Union "assisted RIPTA in its discrimination against her resulting in her constructive then actual termination both by failing to get her

reinstated and failing to get her accommodations." ECF No. 34-1 at 1. Because both the federal and state claims protect against disability discrimination, the Court will treat them collectively.[7]

To set forth a prima facie case for employment discrimination based on disability, three elements must be proven by a preponderance of the evidence: "1) that [s]he was disabled . . .; 2) that [s]he was qualified to perform the essential functions of the job, either with or without a reasonable accommodation; and 3) that the employer took adverse action against [her] because of the disability." *Bailey v. Georgia-Pac. Corp.*, 306 F.3d 1162, 1166 (1st Cir. 2002). This last element parallels Rhode Island's antidiscrimination laws, which holds that a labor organization may not "discriminate against any member because of his or her . . . disability." R.I. Gen. Laws § 28-5-7(3)(iii). The Court need not address the first two elements of this tripartite test, because Ms. Barnes claim lives and dies on the third element.

The crux of this matter is whether the Union discriminated against Ms. Barnes because of her disability. For Ms. Barnes to have an actionable claim, she would have to produce evidence that the Union discriminated against her either in its representation of her, or that it did not adequately represent her, because of her disability. More particularly, Ms. Barnes would have had to set forth evidence, the preponderance of which proves that Union took "adverse action" based on her carpal tunnel condition.

---

[7] Ms. Barnes also seems to assert a claim that the Union did not uphold its duty of fair representation, but that claim is not before the Court because it was not timely filed. *See* ECF No. 18-1 at 2.

There is no evidence before the Court that the Union discriminated against Ms. Barnes because of her disability. More broadly, there is no sign that the Union discriminated against Ms. Barnes at all, either before or during the grievance procedure. The parties skipped Steps 1 and 2 of the grievance procedure with mutual consent. Ms. Barnes, against the wishes of the Union, had no desire to complete the grievance procedure by going to arbitration. She did so in hopes that avoiding this step would preserve a legitimate legal claim. But if anything, it is Ms. Barnes who did not adhere to the grievance procedure by deciding to avoid Step 4.

To the extent that Ms. Barnes claims that Union did not represent her in her workers compensation claim, there is a plausible, nondiscriminatory explanation for doing so. For example, the Union does not represent RIPTA employees during worker's compensation hearings. Indeed, there is a demarcation between the Union's jurisdiction and workers' compensation matters. It was the actions based on her workers compensation claim, to which the Union had no role, which made her unable to return to work despite her doctor's notes. *See* ECF No. 19 at ¶ 179. The Union did not have the authority to intervene in such matters. Thus, to the extent that Ms. Barnes is frustrated with the Union's aid because they did not help with her worker's compensation claim, her disappointment is misplaced.

And despite Ms. Barnes' claims of discrimination, the Union still filed a grievance on her behalf after RIPTA fired her and represented her interests. The Union sought a "reclassification" of her employment and reasonable accommodations

for her to continue being a bus driver. The Union even discussed with her potential accommodations so that they could try to find her work based on those limitations.

The only defendant is the Union and there is zero evidence that the Union, discriminated against Ms. Barnes based on her disability.

## IV. CONCLUSION

There is no dispute as to any material fact here. The record is clear that the Union did not discriminate against Ms. Barnes because of her disability in representing from her injury until RIPTA fired her. If anything, the Union did what it could to help her keep her job. As a result, the Court GRANTS Defendant Amalgamated Transit Union, Local 618's Motion for Summary. ECF No. 18.

IT IS SO ORDERED.

_____
John J. McConnell, Jr.
United States Chief District Judge

August 17, 2022